**Robert O'CONNOR, Plaintiff–Appellant,**

**v.**

**CHICAGO TRANSIT AUTHORITY, Walter H. Clark, Robert E. Paaswell, et al., Defendants–Appellees.**

**No. 91–3747.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 19, 1992.

Decided Feb. 12, 1993.

Linda Friedman and Richard C. Leng (argued), Leng, Stowell, Friedman & Vernon, Chicago, IL, for plaintiff-appellant.

Barry S. Alberts, Catherine Masters Epstein (argued), Lisa A. Weiland, Alana L. Helverson, and Hallie J. Miller, Schiff, Hardin & Waite, Chicago, IL, for defendants-appellees.

Before CUMMINGS and MANION, Circuit Judges, and KAUFMAN, Senior District Judge.*

MANION, Circuit Judge.

Robert O'Connor sued the Chicago Transit Authority ("CTA"), Walter B. Clark, Robert E. Paaswell, Joyce Hughes, Melvyn May, and Howard Medley (hereinafter collectively referred to as "defendants"), under 42 U.S.C. § 1983, for violating his First Amendment rights and equal protection rights. The district court granted sum-

* Hon. Frank A. Kaufman, Senior District Judge for the District of Maryland, is sitting by designation.

mary judgment in favor of the defendants, finding that they were immune from liability on the First Amendment claim under the doctrine of qualified immunity, and that O'Connor necessarily failed in his equal protection claim because he did not demonstrate that he was treated differently than any other similarly situated employees. 778 F.Supp. 967. O'Connor appeals the district court's decision. We affirm.

## I. Facts

In 1981, then Mayor Jane Byrne appointed Robert O'Connor, a Chicago policeman since 1962, as Manager of Labor Relations for the CTA. Harold Washington replaced Byrne as mayor in 1983. In April, 1984, O'Connor was transferred to a newly created position within the CTA—Manager of Police Liaison. In that position, O'Connor served as a liaison between the CTA and state and federal law enforcement agencies. He also assumed some responsibility over investigative activities. In the summer of 1986, Mayor Washington appointed Walter Clark to the CTA Board of Directors; in the fall of the same year the other directors elected Clark Chairman of the Board. On Mayor Washington's recommendation, the Board hired Robert Paaswell as Executive Director of the CTA on November 10, 1986. Under the CTA structure which existed at the time, O'Connor reported directly to the Executive Director.

On November 19, 1986, a CTA auditor, John Roth, notified Paaswell that Art's Transportation, a CTA contractor, was engaging in fraudulent billing and other improprieties. In a memo dated November 21, O'Connor summarized for Paaswell the status of the Art's Transportation probe, and promised to perform a full investigation. Paaswell referred information relating to Art's Transportation to the General Attorney of the CTA, and O'Connor took no further action on the matter. There is evidence that at least one CTA official was not pleased with the Art's inquiry. Roth testified in his deposition that Ernest Sawyer, a CTA official, called him into his office and criticized him for putting suspicions relating to Art's Transportation in writing. Sawyer also expressed concern that the matter might be leaked to the press.

In early 1987, O'Connor became involved in an investigation of Metropolitan Petroleum Company, a major fuel supplier to the CTA. An accountant with the internal audit department, Peter Zelkovich, had discovered improprieties in Metropolitan's billing practices. Zelkovich published his conclusions regarding these and other improprieties relating to Metropolitan in an audit report. In a portion of an internal memorandum to Zelkovich dated March 19, 1987—dealing generally with internal audit procedures—Chairman Clark criticized the procedures employed in the Metropolitan audit. Additionally, O'Connor submits as evidence Zelkovich's unsworn statement in which he alleges that Board member Medley criticized the audit.

After Paaswell's appointment, O'Connor—a white man—began to investigate independently what he describes on appeal as "unusual hiring practices" at the CTA. He sensed that the CTA was applying racial preferences in hiring; specifically, that the CTA favored blacks in employment decisions. He feared that this race-motivated hiring was done without sufficient regard for qualifications. He conducted this investigation informally, by asking general questions of CTA employees about their knowledge of recent hires. He also inquired into the adequacy of the urine tests and background checks sometimes administered to new employees. He kept this investigation secret, and did not report its existence or results to any of the defendants. On February 20, 1987, O'Connor sent a memo to Earl McGhee requesting that he provide a list of recent hires for whom background checks had been canceled. In his brief, O'Connor claims that he repeated this request when he met with McGhee on February 26.

In a letter dated February 27, 1987, Paaswell suspended O'Connor with pay for ten days, citing as the reason the need to investigate the propriety of certain decisions made by O'Connor in his position as Manager of Police Liaison. Specifically,

Paaswell became aware sometime in early February 1987 that O'Connor had hired several CTA employees "on a handshake" without complying with established CTA procedures.[1] During O'Connor's suspension, Paaswell also sought to review other actions by O'Connor, including his granting of wage and vacation benefits to an employee of an independent contractor, and his use of expense accounts and petty cash. Paaswell extended O'Connor's paid suspension through March 30, 1987, and gave O'Connor an opportunity to respond to the matters being investigated.

O'Connor never responded. Instead, on March 12, 1987, O'Connor filed his original complaint in this case against Paaswell, the CTA and each member of its Board of Directors. He alleged that he was suspended because of his political affiliation with former Mayor Byrne, because of his investigations—which he claimed were protected under the First Amendment—and because of his race. On March 19, Paaswell implemented a CTA reorganization which effectively eliminated O'Connor's job by merging the Police Liaison Department with the Industrial Safety Department.[2] Paaswell claims that he considered O'Connor to manage the newly created department, but instead gave the position to Melvin May, a black man, whose credentials included a Ph.D. from Northwestern University, and experience as head of security for Cook County Hospital. By a letter dated April 6, 1987, Paaswell offered O'Connor the job of Director of Investigations which was the next highest position in the newly created department. O'Connor accepted and his pay and benefits remained the same.

Soon after assuming his new position, O'Connor began complaining about the methods used by May in running the office. His treatment of May during this period is best described as insubordinate. He publicly admitted a lack of respect for May, and refused to comply with May's requests on several occasions. Significantly, in a grievance filed on June 25, 1987, O'Connor recognized that his relationship with his superiors had deteriorated to the extent that they "along with almost all of the personnel of the Police Liaison Department, ha[d] been affected adversely in [their] work." In a particularly telling incident, on June 26, May asked O'Connor to relocate his office, from the 18th floor to the 4th floor. O'Connor refused to move, and stayed on the 18th floor. His given reason for not moving was that he needed to be on the 18th floor because he was spending his days working on the document requests made in this lawsuit, and his 18th floor office was better suited for that purpose.

On September 9, Paaswell asked O'Connor as Director of Investigations to look into possible improprieties in the ordering of parts at the CTA's maintenance facilities. O'Connor characterizes this assignment as "liberation" from May. Because he was to report directly to Paaswell on this assignment, O'Connor believed he was released from the authority of May. O'Connor relied upon this "liberation" to continue to exercise insubordinate behavior; he absolutely refused to follow any of

1. This would not have been the first time O'Connor skirted established procedures in hiring employees. In 1986, O'Connor caused a minor problem at the CTA when he hired a parking lot attendant without complying with the usual procedure.

2. O'Connor claims that the reorganization was part of an overall plan at the CTA to eliminate white management workers not originally employed during the Harold Washington administration. In support of this theory, O'Connor cites a memo from Joyce Hughes, the CTA's General Attorney, which recommends a legal procedure for increasing the efficiency of the General Attorney Division by eliminating the positions of certain employees. However, O'Connor makes no connection between this memo and the reorganization of his department. Further, there is a vast difference between eliminating employees to increase efficiency and eliminating white employees. Even though the facts should be read in the light most favorable to O'Connor, this standard does not require that we make the leap of cynicism O'Connor suggests: to assume that Hughes' memo proposed a method of racial purging, rather than simply a method of efficient and legal reorganization of the General Attorney Division. Such an inference is not permissible simply from the memo's content.

May's directives. In response to a request by May to account for the time spent on the parts investigation, O'Connor sent the memo back to May with "NO! NO!" written in large letters at the bottom. He refused to attend his performance evaluation with May. O'Connor continued to skirt May's directive to move his office to the 4th floor. In response to a November 4 memo by May directing O'Connor to move to the 4th floor, O'Connor sent May a memo in which he refused to move his office and accused May of being inept. Both Paaswell and May reminded O'Connor that he continued under May's authority under the existing CTA structure. On November 13, 1987, Paaswell fired O'Connor from his position with the CTA for gross insubordination and poor work performance.

## II. District Court Proceedings

After he was terminated, O'Connor amended his complaint three times; his Third Amended Complaint, filed on January 5, 1991, made claims under 42 U.S.C. § 1983 for violation of his First Amendment right to engage in protected speech while at the CTA and for violation of his Fourteenth Amendment right to equal protection of the law. The defendants filed motions for summary judgment on the two claims remaining in the Third Amended Complaint and the district court granted those motions. O'Connor appeals, contending that the district court improperly applied the doctrine of qualified immunity and that the record at least presents questions of fact concerning the equal protection claim.

■ We review a district court's grant of summary judgment *de novo. Prince v. Zazove,* 959 F.2d 1395, 1398 (7th Cir.1992). Summary judgment is authorized if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). In determining whether summary judgment is appropriate, we must view the evidence in the light most favorable to the non-moving party. *Id.* at 255, 106 S.Ct. at 2514. If the evidence is subject to conflicting interpretations, or if reasonable people might differ as to its significance, summary judgment is not appropriate. *Egger v. Phillips,* 669 F.2d 497, 502 (7th Cir.1982).

## III. First Amendment Claim

■ The district court granted summary judgment on the First Amendment claim, finding that the defendants were immune from suit under the cloak of qualified immunity. The court relied upon our *en banc* decision in *Rakovich v. Wade,* 850 F.2d 1180 (7th Cir.), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988), in which we applied the objective test for qualified immunity set forth in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1987). *Harlow* authorized a common sense application of the qualified immunity defense—"that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. This objective test has an important practical effect in a court's ability to consider efficiently suits against public officials. An objective inquiry into the coincident constitutionality of the public official's alleged retaliatory action can be made on summary judgment. Therefore, "the purpose of an objective qualified immunity inquiry is to avoid unnecessary burdens on government officials by more frequent use of the summary judgment tool...." *Rakovich,* 850 F.2d at 1204. *See also Harlow,* 457 U.S. at 814, 102 S.Ct. at 2736 (Qualified immunity allows courts to quickly terminate insubstantial lawsuits, without denying worthy claimants their day in court). *Rakovich* frames the test as follows:

> Once the defendant's actions are defined or characterized according to the specific facts of the case this characterization is compared to the body of law existing at

the time of the alleged violation to determine if constitutional, statutory, or case law shows that the now specifically defined actions violated the clearly established law. It is the plaintiff who bears the burden of establishing the existence of the allegedly clearly established constitutional right. The factual circumstances of the alleged violation need not be 'identical' to prior holdings in order to find an officer entitled to qualified immunity. Nonetheless, closely analogous cases, those decided before the defendants acted or failed to act, are required to find that a constitutional right is clearly established.

*Rakovich,* 850 F.2d at 1209 (citations omitted).

The district court assumed for the purposes of applying the objective test that the defendants suspended and fired O'Connor for whistleblowing activities.[3] All parties concede that clearly established case law at the time of O'Connor's suspension and firing indicated that public officials violate the First Amendment by retaliating for protected speech. *See Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1980). The district court added to its analysis that O'Connor also was suspended and fired because of his gross insubordination. The court concluded that because no case existed at the time of O'Connor's suspension and firing making it unlawful to terminate an employee both for protected speech and for gross insubordination—for a mixed motive—that the defendants were entitled to qualified immunity.

The problem with the district court's holding is that it adds a subjective element to the objective test; it resolves the issue of the defendants' motivation by assuming that they possessed a "mixed motive". *Cf. Egger,* 669 F.2d at 504 ("defendant's assertion of good faith immunity raises precisely the same issue of motive and intent as does plaintiff's First Amendment claim"). This conclusion ignores the claim which O'Connor advances—that his suspension and termination were motivated by his protected speech. The district court should have first determined whether the record supports this claim before summarily resolving it. *See Conner v. Reinhard,* 847 F.2d 384, 398 (7th Cir.1988) (Cudahy, J. concurring) ("where the legality of the actions of a section 1983 defendant depends upon the defendant's motive or intent, the qualified immunity inquiry cannot be confined to a purely objective view of defendant's actions."), *cert. denied,* 488 U.S. 856, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988); *see also Feliciano-Angulo v. Rivera-Cruz,* 858 F.2d 40, 47 (1st Cir.1988) ("As there was a disputed factual issue regarding why defendant dismissed plaintiff, the district court was in no position to grant summary judgment in defendant's favor on the issue of qualified immunity against plaintiff's First Amendment claims. Resolution of this issue is a predicate to any meaningful qualified immunity analysis.")[4] In essence, the district court failed to accurately define or characterize the defendants' actions. Such characterization is a prerequisite to application of the objective test for qualified immunity. *See Rakovich,* 850 F.2d at 1209.

Therefore, the district court erred in its application of qualified immunity in

3. O'Connor refers to four categories of alleged retaliatory conduct: his suspension, his demotion, his harassment and his termination. Our reference to suspension and/or termination encompasses all of these categories.

4. To determine summarily that the defendants had a "mixed motive" for suspending and terminating O'Connor permits

> an official to be granted qualified immunity as a matter of law even though the principal disputed question of fact in the case—the true purpose of intent motivating the official's conduct—remains unresolved. More accurately, [the defendant's position would mean that] the principal disputed question of fact, which forms the basis of the substantive claim, is subsumed by the legal immunity inquiry and implicitly resolved by the court against the plaintiff when it concludes, on the basis of nothing more than the official's pretextual assertions, that the allegedly unconstitutional conduct contravened no clearly established law.

*Feliciano-Angulo,* 858 F.2d at 46, quoting Note, *Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in Civil Rights Litigation,* 95 Yale L.J. 126, 138 (1985).

granting summary judgment. However, we may affirm the court's judgment upon any other ground that is supported by the record. *Conner,* 847 F.2d at 393. When faced with a possible "mixed motive" a court must ascertain the cause of the allegedly retaliatory action. *Rakovich,* 850 F.2d at 1189. In *Mt. Healthy City School Dist. Board of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), the Supreme Court confronted the issue of causation in a retaliatory discharge case. The Court placed the burden on the plaintiff alleging retaliation for the exercise of constitutionally protected rights to show that the protected conduct was a "substantial" or "motivating" factor in the defendant's action. *Id.* at 287, 97 S.Ct. at 576. *Rakovich* explains this burden as follows:

> The plaintiff's burden of establishing that the substantial or motivating factor was retaliation is a *burden of persuasion,* which he must prove by a preponderance of the evidence. The plaintiff's burden is not so facile that he can carry it by showing 'only that elimination of the protected activity may have been welcomed by the defendant or even that such activity played some minor role in the discharge decision.' Neither is it so burdensome that the plaintiff must show that the defendant's desire to inhibit protected conduct was the sole motive for his actions. In fact, the plaintiff need not even go as far as showing that 'a particular purpose was the dominant or primary one.' This court has stated that in order to carry his or her burden, the plaintiff must show *'had it not been for the violation,* the injury of which he complains would not have occurred....'

*Rakovich,* 850 F.2d at 1189–1190 (citations omitted).

Under *Mt. Healthy* we must decide whether one might reasonably infer from the facts of record that O'Connor's alleged First Amendment activity was a substantial or motivating factor in his suspension and termination. O'Connor bases his First Amendment claim upon three instances of allegedly protected activity: his investigation of Art's Transportation and Metropolitan Petroleum Company, his private investigation into "unusual hiring practices" at the CTA, and his lawsuit. For the sake of clarity, we consider each instance of allegedly protected speech separately.

*A. Investigations of Art's and Metropolitan*

█ Three months before his suspension, O'Connor participated in the investigation of Art's. Two months before his suspension, O'Connor participated in the investigation of Metropolitan. He argues that the proximity of those investigations to his suspension creates an inference that they motivated his suspension and other adverse employment decisions. However, the mere fact that protected speech precedes an employment decision does not create the inference that the speech motivated the employment decision. As we stated in *Rakovich:*

> [E]vidence of some disagreement or dislike must be accompanied by evidence linking it to the injury. More than mere speculation must serve as the basis for finding that such disagreement is the motivating cause. If this link is not made a reasonable jury could not find that the disagreement motivated the defendant; thus, the defendant should prevail on the motion.

*Rakovich,* 850 F.2d at 1191.

█ In this case, there is nothing but mere speculation to link O'Connor's suspension and ultimate termination to his role in investigating Art's and Metropolitan. One of O'Connor's responsibilities at the CTA was to conduct and supervise investigations. Because he was by profession an investigator, it is likely that any employment decision concerning him would have been preceded by his participation in investigations. If we were to infer from his investigations a possible motivation on the part of his superiors to suspend or fire him, we would effectively preclude summary judgment in all cases where internal investigators bring suit alleging unconstitutional retaliation. We would create a presumed link between the investigations and the adverse employment decisions.

O'Connor purports to present evidence that his superiors overtly and covertly opposed his investigations. The evidence, however, supports only the inference that Roth and Zelkovich were criticized for their roles in the investigations.[5] Even assuming that there may have been criticism of these investigations, this does not create an inference that O'Connor was fired in retaliation for them. A plaintiff alleging retaliatory suspension and discharge does not meet his burden under *Mt. Healthy* simply by showing that elimination of the protected activity may have been welcomed by the defendants. *Rakovich,* 850 F.2d at 1189. It is likely that an internal investigation into any matter would be criticized at some level.

*B. Investigation into "Unusual Hiring Practices"*

O'Connor next argues that his suspension and ultimate termination were due to his investigation of "unusual hiring practices" at the CTA. Sometime after the Harold Washington administration came to power in Chicago, O'Connor developed a suspicion that the CTA was skirting established procedures and hiring unqualified black employees. O'Connor claims to have conducted an investigation into this hiring practice in secret, without informing any of his superiors. He sensed that to tell his superiors of this investigation "would be really the best way to see the investigation completely obstructed." Prior to March 12, 1987, the date he filed his lawsuit, the only evidence linking this investigation to someone other than himself was his February 20 memo to Earl McGhee requesting a list of recent hires for whom background checks had been canceled. O'Connor presents no evidence that McGhee disclosed this request to any of the defendants. Even if McGhee did, it is unlikely that the defendants would have been able to deduce from the content of the request that O'Connor was conducting a full-blown private investigation into the CTA's policies regarding the hiring of blacks.

O'Connor first revealed his suspicions about unusual hiring practices at the CTA in paragraph 26 of his original complaint, filed on March 12, 1987, while he was serving his suspension.[6] He alleges only that "[o]n February 26, 1987, the day prior to his suspension, the plaintiff *sought to initiate* a full investigation into certain unusual hiring practices newly put in place at the CTA." (Emphasis added.) The defendants could not have derived from the content of the complaint that O'Connor had already conducted a detailed investigation into hiring practices prior to February 26, as he now claims. The complaint invites only the opposite inference—that O'Connor had not conducted any investigation but was ready to "initiate" one when he was suspended.

We are left, therefore, with an improbable scenario. O'Connor claims that his private investigation into "unusual hiring practices" at the CTA caused his suspension and termination. However, one cannot reasonably infer from the facts of record that anyone responsible for employment decisions concerning O'Connor even knew of this investigation. The record as presented by O'Connor reveals only that he intended at all times to keep the existence and results of this investigation from his superiors, lest they attempt to disrupt it. Even when he filed his lawsuit, he revealed

5. O'Connor presents the testimony of John Roth, who claims that Ernest Sawyer was critical of Roth's investigation into Art's. He also presents the unsworn statement of Peter Zelkovich who claims that he was criticized for the Metropolitan audit. Finally he provides a memo from chairman Clark critical of Zelkovich's audit procedures concerning Metropolitan.

O'Connor also claims that he was removed by Paaswell from the Art's investigation, but the record evidence does not support his contention. O'Connor bases the supposition that he was removed upon the fact that Paaswell told him to give his file to the Legal Department. Paaswell denies that he removed O'Connor from the Art's probe—O'Connor promised to conduct a full investigation and Paaswell never asked him not to. To support his claim, O'Connor should have presented some evidence that a request to turn over a file to the Legal Department is tantamount to removal from an investigation.

6. O'Connor did not file a First Amended Complaint until December 17, 1987, more than a month after he was terminated.

only that he sought to initiate an investigation, not that he had conducted one. Allegedly protected speech cannot be proven to motivate retaliation, if there is no evidence that the defendants knew of the protected speech. *Cusson-Cobb v. O'Lessker,* 953 F.2d 1079, 1081 (7th Cir.1992); *see also Caldwell v. City of Elwood, Indiana,* 959 F.2d 670, 672 (7th Cir.1992) (affirming district court's grant of motion to dismiss because plaintiff failed to plead that defendants knew of protected speech allegedly causing termination). From the facts as presented, no reasonable juror could conclude that O'Connor's covert investigation into the CTA's hiring practices motivated the decision to suspend and terminate him.

Even if we were to conclude that the defendants knew of O'Connor's private investigation, there are not sufficient other facts of record linking the investigation to the suspension and termination to survive summary judgment. As with the investigations of Art's and Metropolitan, a reasonable juror would be left to infer that just because the private investigation preceded O'Connor's suspension and firing, it caused them. Such an inference would not be permissible. Of course, if O'Connor's superiors knew that he was snooping around the halls of the CTA selectively investigating black employees based upon his gut suspicion that the black employees were unqualified, they might well have been justified in firing him for disrupting the workplace. *See Breuer v. Hart,* 909 F.2d 1035, 1040 (7th Cir.1990). However, we need not assess the disruptive effect of O'Connor's private investigation, because there is not sufficient record evidence that his superiors knew of it.

*C. The Lawsuit*

Finally, O'Connor claims that the filing of his lawsuit caused his suspension and termination. Unlike O'Connor's secret investigation into CTA hiring practices, we infer from the record that his superiors had knowledge of the lawsuit—most were defendants. Even though those responsible for the decision to terminate him had knowledge of the lawsuit, however, O'Connor fails to create a sufficient link between the lawsuit and his firing. He asks us to speculate that just because he filed a lawsuit, he was fired. As we have previously stated, the fact that protected speech may precede an adverse employment decision alone does not establish causation under *Mt. Healthy.*

The facts of record relating to the lawsuit point away from the inference that the lawsuit caused O'Connor's firing. The original complaint was filed on March 12, 1987. The firing did not take place until nine months later. As we held in *McClure v. Cywinski,* 686 F.2d 541, 546 (7th Cir. 1982), a lapse of time between the allegedly protected speech (in that case, a lapse of only 3½ months) and an adverse employment decision "severely undercuts the weight we must otherwise attribute" to whether the speech caused the termination. After filing the lawsuit, O'Connor was given a fresh start; in April of 1987 he was given a position in a newly-created department under May. By July, the relationship between O'Connor and May had so deteriorated that it was undermining the newly-created department. O'Connor proposes that May harassed him in retaliation for the lawsuit. Under the facts as they existed, however, May would have had no reason to retaliate against O'Connor for his allegedly protected speech by intentionally creating a difficult work atmosphere. May was not yet a defendant in the lawsuit. He was only joined after O'Connor was fired. Nor was May implicated in any of O'Connor's official investigations. In sum, the only fact from which a jury could infer that the lawsuit motivated O'Connor's firing is that the lawsuit preceded the firing. This fact is not sufficient to create a reasonable inference of causation.

Even if we were to conclude differently—that a reasonable juror might infer that the lawsuit caused the adverse employment decisions—O'Connor's conduct in pursuing the lawsuit was so disruptive of the workplace that his employers would have been justified in firing him on that basis. *See Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734 (even though public employees do not relinquish First Amendment

rights upon employment, they implicitly agree that rights to speech may be balanced against employer's interests in managing the workplace). We have identified four factors emanating from *Pickering*, which a court must consider in balancing the employee's First Amendment interest against the employer's need to manage the workplace:

> (1) the need to maintain discipline or harmony among co-workers; (2) the need for confidentiality; (3) the need to curtail conduct which impedes the [employee's] proper and competent performance of his daily duties; and (4) the need to encourage a close and personal relationship between the employee and his superiors, where that relationship calls for loyalty and confidence.

*Breuer v. Hart,* 909 F.2d at 1039–40.

In assessing this balance, "[t]he initial, and often determinative, question is whether the speech interferes with the employee's work or with the efficient and successful operation of the office." *Knapp v. Whitaker,* 757 F.2d 827, 842 (7th Cir.1985), *cert. denied,* 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985). In this case, O'Connor took a harsh adversarial posture toward his superiors in pursuing his lawsuit. He refused to take direction, and spent his days on the job working on discovery requests. He used his lawsuit as an excuse to refuse to move his office from the 18th floor to the 4th floor; he claimed his 18th floor office was better suited to organize his litigation. He admitted in his grievance filed on June 25, 1987 that his relationship with his superiors had deteriorated to the point that it was adversely affecting his work and that of the Department. In short, O'Connor was so disruptive in conducting his lawsuit that his superiors would have been justified in firing him because of it.

## IV. Equal Protection

Besides his First Amendment claim, O'Connor makes a second § 1983 claim: that the defendants denied him his Fourteenth Amendment right to equal protection of the law. The district court granted summary judgment in favor of the defendants on this issue, holding that O'Connor failed to support his equal protection claim. We agree. In order to avoid summary judgment, O'Connor was required to introduce evidence that he was treated differently from other similarly situated employees. *Sims v. Mulcahy,* 902 F.2d 524, 538 (7th Cir.), *cert. denied,* 498 U.S. 897, 111 S.Ct. 249, 112 L.Ed.2d 207 (1990). We have concluded that O'Connor's alleged whistleblowing activities did not motivate the adverse employment decisions concerning him. Therefore, this becomes a case where an employee with an undisputed record of gross insubordination towards his superiors suffers adverse employment decisions. To make a prima facie case, O'Connor would have to show that another grossly insubordinate worker was treated better than him. *Id.* at 539. He would also have to demonstrate that the defendants acted with discriminatory intent. *Id.* He produced no such evidence. Because there is no evidence indicating disparate treatment or discriminatory intent, no reasonable juror could possibly infer an equal protection violation.

## V. Conclusion

The district court erred in granting summary judgment based on qualified immunity. We affirm the district court's judgment on an alternative basis—that under *Mt. Healthy,* the alleged protected speech did not cause the alleged retaliation. Further, we conclude that the district court properly resolved the equal protection issue. Because we decide that O'Connor failed to demonstrate a deprivation of constitutional rights under Section 1983, we need not decide whether the CTA could have been liable for a custom and policy of constitutional deprivation. Obviously, because its employees did not exhibit such a practice, it is unlikely that the CTA had such a custom and policy. We also need not scour the record to determine the degree of the individual defendants' responsibilities over employment decisions concerning O'Connor. We note, based upon our review of the record on other issues, that we have found no credible evidence tying

Hughes and Medley to the employment decisions. The district court's judgment is

AFFIRMED.