**Paul J. HOFFMAN, Plaintiff,**

v.

**MCA, INC., Defendant.**

**No. 95 C 6481.**

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 1, 1997.

---

**1.** Defendants claim that Dr. Steven Reilly was erroneously identified as Dr. Timothy Reilly.

## *OPINION AND ORDER*

NORGLE, District Judge.

Plaintiff Paul J. Hoffman ("Hoffman") filed the instant suit, alleging age discrimination in violation of the Age Discrimination in Employment Act. ("ADEA"), 29 U.S.C. §§ 623(a) & 631(a). Before the court are Defendant MCA, Inc.'s ("MCA") Motion to Strike and MCA's Motion for Summary Judgment. For the following reasons, the motion to strike is denied and the motion for summary judgment is granted.

### I. FACTS [1,2]

MCA hired Hoffman on December 5, 1977, as a sales representative in its Chicago sales office. MCA employed Hoffman through a series of employment contracts. MCA fired

---

**1.** The following facts are taken from the court's

reconciliation of the parties Local Rule 12(M)

Hoffman in June 1994, at which time he was a Vice President/Midwest Regional Manager ("VP/MRM").

MCA is a television syndicator which sells television programs to television stations. MCA has various sales offices throughout the United States, from which it sells to regional markets. Hoffman was one of ten sales representatives in the sales division.

As a matter of practice, MCA gave sales representatives, including Hoffman, a raise and bonus each year. MCA did not conduct formal performance reviews. Each year, Hoffman was one of the top producers of sales revenue for the division.

In 1988, Hoffman began reporting to James Kraus ("Kraus"). Kraus is twelve years younger than Hoffman.

In 1991, MCA promoted Hoffman to VP/ MRM. In that position, Hoffman retained the duties he held as a sales representative, and became additionally responsible for supervising other sales representatives in the Chicago office. As VP/MRM, Hoffman still reported directly to Kraus, the Executive Vice President/Director of Sales and Marketing, who in turn reported to Shelly Schwab ("Schwab"), the President of MCA Television, who was born in 1936.

As Hoffman's direct supervisor, Kraus was entitled to monitor Hoffman's performance and know his whereabouts. Kraus testified that he would hypothetically treat a performance deficiency by a subordinate as follows: "You let him or her know that there is an issue and a concern, and you address it up front. Then you make suggestions to remedy the situation, in whatever form that may take." (Kraus Dep. at 109.)

In 1991, MCA negotiated the last of a succession of employment contracts between MCA and Hoffman, for the period from January 1, 1992, through December 31, 1994. The contract provided that MCA had no obligation to renew the contract upon its expiration, or to utilize Hoffman's services during the contract term.

On August 16, 1991, Kraus met with Dan McKimm ("McKimm"), a sales representative whom Hoffman supervised in Chicago. Kraus' affidavit states that McKimm complained of Hoffman's conduct during a meeting with customers in Indianapolis, in which Hoffman abruptly closed his briefcase and walked out, stating, "I knew you guys were jerking us around." (Kraus Decl. ¶ 4.) Kraus' affidavit also states that McKimm indicated to Kraus that Hoffman's conduct stunned and confused everyone at the meeting. Hoffman denies that he behaved in such a manner.

Kraus' affidavit also states that, in September 1991, McKimm informed Kraus that McKimm was breaking his contract with MCA to take a job with the Tribune Company, a competitor of MCA. According to Kraus' affidavit, McKimm indicated to Kraus that Hoffman gave McKimm permission to interview and stated that he would not hold McKimm back.

Hoffman did not have authority to alter any contract McKimm had with MCA. Still, Hoffman states that he was unaware that McKimm was under contract with MCA. Further, Hoffman states that he did not give McKimm permission to interview. Hoffman admits that both Schwab and Kraus notified Hoffman of McKimm's departure, but denies MCA's allegation that Schwab and Kraus told Hoffman that his actions regarding the incident were inappropriate.[3] Hoffman de-

and 12(N) statements. As provided by the rule, the court will not accept statements of fact not supported by evidence and statements not denied using evidence are deemed admitted. The court notes that, where deposition and affidavit testimony conflict, the court accepts as true the deposition testimony. *See Darnell v. Target Stores,* 16 F.3d 174 (7th Cir.1994).

**2.** At summary judgment, the court may consider only evidence which would be admissible at trial under the Federal Rules of Evidence. *Whitted v. General Motors Corp.,* 58 F.3d 1200, 1204 (7th Cir.1995). MCA moves to strike various portions

of Hoffman's affidavit. Because Hoffman's characterizations of various facts might be admissible at trial, the court will consider them, the court denies the motion to strike. However, the court considers MCA's motion to strike arguments, and Hoffman's responses, in its overall analysis of the instant summary judgment motion.

**3.** The court notes that Hoffman at his deposition did "not remember" whether Schwab or Kraus told Hoffman that his actions were inappropriate. In his affidavit, Hoffman specifically denies that they did so.

nies that the McKimm incidents factored into MCA's termination decision.

On February 18, 1991, MCA hired Kristie Orr ("Orr") as a salesperson in the Chicago office. Orr reported directly to Hoffman, her supervisor. In October 1991, MCA held a sales meeting for all sales staff. At the meeting, Orr complained to Kraus that Hoffman made her life "a living hell." (Kraus Decl. ¶ 6.) Kraus deduced from Orr's performance that Hoffman was not adequately training or supervising Orr. Hoffman's affidavit states that Kraus complained to Hoffman several times about Orr's demeanor and job performance.

Kraus and Schwab state in their affidavits that, based on Orr's complaints and Kraus' observations, MCA determined that Orr should report to Steve Rosenberg of the New York City office, rather than to Hoffman. Hoffman's affidavit states that the change was made not because of Orr's complaints, but rather because Hoffman had complained to Kraus that he could not work with Orr after she made some intensely personal and inappropriate remarks to him. According to Hoffman, Hoffman told Kraus of these remarks, and Kraus did not fault Hoffman for feeling uncomfortable with them. The change of Orr's supervisor divested Hoffman of any supervisory authority over any sales staff.[4]

On November 18, 1991, Kraus expressed concern to Hoffman regarding Hoffman's lack of communication with Kraus, and asked that they attempt to improve their business relationship. Kraus' affidavit states that Kraus informed Hoffman of three general expectations Kraus had of Hoffman: advising Kraus in advance of travel plans, calling Kraus with a progress report during market visits, and advising Kraus of progress of negotiations as they occur. Hoffman's affidavit denies that Kraus expressed concern regarding Hoffman's failure to follow of

MCA's procedures for reporting travel. Hoffman states that he followed MCA's travel procedures at all times during his seventeen-years of employment.

Following the November 18, 1991, conversation, Kraus sent Hoffman a memo on November 22, 1991, memorializing his expectations. Hoffman believes that Kraus sent the memo "as part of his campaign to have Hoffman fired in late 1991."[5] (Hoffman Decl. at ¶ 9.) The memo instructed Hoffman to, among other things, call Kraus on Friday or Monday to inform Kraus of Hoffman's travel plans for the upcoming week, apprise other sales offices about cross-over markets or other prospective deals in advance of final negotiations, and keep regular working hours and be accessible during those hours.

The guidelines for communication Kraus set forth applied to everyone under Kraus' supervision. Hoffman states that he did keep regular working hours.

Hoffman states that, on November 25, 1991, the Monday before Thanksgiving, Hoffman called Kraus in order to apprise him of Hoffman's plans for a trip to Minneapolis the following week. Kraus did not return the call. When Kraus called the Chicago office on the Wednesday before Thanksgiving, he left a message on an answering machine and did not receive a return phone call until 2.5 hours later. Kraus says that, when they spoke, he reminded Hoffman of Hoffman's obligation to keep Kraus posted on Hoffman's whereabouts during working hours; Hoffman denies such a reminder.

On December 3, 1991, Kraus spoke with Hoffman again, at his hotel room in Minneapolis. Kraus did not believe that Hoffman had contacted Kraus regarding the trip in advance. Hoffman told Kraus that Hoffman had informed Kraus the week before. The conversation became heated. Although MCA

---

**4.** Hoffman offers evidence that MCA treated Orr and other younger employees differently than Hoffman. However, because they were subordinate to Hoffman and not in the same position, they cannot be considered "similarly situated" for purposes of evaluating Hoffman's ADEA claim. Thus, MCA's treatment of them is not relevant to the court's analysis of similarly-situated younger employees. *See. e.g., Smith v. Cook County,* 74 F.3d 829, 831 (7th Cir.1996) (stating

that employees were not similarly situated for purposes of comparison where one employee was lower in authority and responsibility); *see also, Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035 (7th Cir.1993).

**5.** The court notes that Hoffman is not competent to testify regarding Kraus' intentions, and would not be permitted to do so at trial.

and Hoffman do not agree as to who used vulgar language, they do agree that at least one party to the conversation did so. Kraus believed that it was inappropriate for Hoffman to speak to him as he did. Kraus hung up on Hoffman. It seemed to Hoffman that Kraus was obsessed with Hoffman's whereabouts.

Kraus recommended to Schwab that MCA should not renegotiate Hoffman's contract, which was set to expire December 31, 1991. In late 1991, Kraus sent two confidential memos to Schwab regarding Kraus' concerns about Hoffman's job performance. Kraus did not place the memos in Hoffman's corporate personnel file, but retained the memos in Kraus' file on Hoffman. From January 1991, Kraus did not document his concerns about other employees through confidential memoranda to the separate files he maintained for them. Hoffman asserts that several of the incidents Kraus documented in the memos were "false and misleading," including mischaracterizations of Hoffman's reporting to Kraus and appearing for sales meeting in a timely manner. Both Kraus and Schwab testified that the reported incidents involved serious problems. MCA denies that the reported incidents were false and misleading.

Schwab overruled Kraus' recommendation not to renew Hoffman's contract in 1991, and MCA renewed the contract for another three years. Kraus stated that Hoffman "was deemed somebody we wanted to keep at the company." (Kraus Dep. at 74.)

Kraus testified that he did not recall any problems with Hoffman's job performance in the entirety of 1992.

On March 3, 1993, Kraus received a call from Cameron Hutton of KITN in Minneapolis regarding Hoffman's relationship with the station. Hutton informed Kraus that Rip Riordan, the General Manager, desired to have another sales representative from MCA call on the station, because Riordan did not believe that he could develop a workable relationship with Hoffman. Hutton further indicated that Riordan found Hoffman to be negative, sarcastic, and insulting during a recent telephone conversation. Riordan had previously complained about Hoffman at the National Association of Television Program Executives ("NATPE") Conference in 1993, when he asked to have someone else service his stations. Complaints from station managers regarding sales representatives were not common, but all sales representatives received complaints.

Hoffman alleges that Kraus never informed Hoffman of these complaints, although Kraus denies this. Kraus prepared a confidential memorandum regarding the incident. It is unclear from the record whether Kraus ever sent the memo to either Schwab or Hoffman.

In 1994, Kraus began a computer file on Hoffman because he was concerned about Hoffman's behavior and attitude and sensed that Hoffman had gotten to a point where Kraus felt MCA would have to take action.

In January 1994, Hoffman, Kraus, Schwab, and other MCA sales representatives attended the NATPE meeting. At that meeting, Schwab convened the MCA sales force for a meeting at the end of each day to give updates on any sales activity and build morale. During those sales meetings, Schwab asked each sales representative to state what he or she had done that day. Schwab expected each sales representative to give a "positive recitation" of all efforts made during the day.

On the first day of the meeting, when asked about his sales activity for the day, Hoffman responded, "I had a lot of activity, but not much happened. I did not get any business. I did not get any orders." (Hoffman Dep. 378–79.) Schwab perceived the "negative" answer as having a negative effect on the rest of the sales staff. (Schwab Decl. at ¶ 7.)

On February 25, 1994, Kraus received a telephone call from Sherrie Burns ("Burns") of WAS–TV in Chicago. Burns expressed her anger over a conversation she had with Hoffman about a television program. Apparently, Hoffman had interpreted a response from Burns as an "offer"; when she told Hoffman that her response was not an "offer," he responded confrontationally. Hoffman stated, "Why are you always so goddamned uptight?" causing Burns to hang up on him. (Kraus Decl. ¶ 16.)

Kraus called Hoffman, informing him of Burns' unhappiness. Kraus also sent another confidential memorandum to Schwab regarding the incident. The memo stated: "This pattern is unacceptable for anyone in a sales position here, and I feel strongly we should consider all potential remedies for this continuing problem." (Ex. N. 12(N) Stmt.) Kraus did not send the memo to Hoffman.

Hoffman denies making the alleged statement to Burns. Hoffman did call Burns to apologize about the incident. He closed the deal with Burns.

In June 1994, MCA held a sales meeting for the entire sales staff of MCA to prepare for the launch of a new show and to improve sales generally. On the last day of the sales meeting, Schwab conducted a closing meeting. At the close of Schwab's presentation, he asked whether the sales staff could think of anything to further the sales effort. "It was generally recognized that when [Schwab] was in his tirade mood at the end of these sales meetings all you really had to do was say, 'Here's where I am in this market, this is where I expect to be in this market, this is the timetable in this market' and move on."

Instead, in response to Schwab's question, Hoffman asked, "Do we feel that we have good relationships with the [broadcast] group headquarters?" (Forgea Dep. at 80.) No sales representative had ever made a statement similar to Hoffman's at a sales meeting. Another attendee at the meeting believed that Hoffman's response "suggested ... that [Schwab and Kraus weren't] doing their job, and, as a result, his market was not cleared." (Forgea Dep. at 80.) Yet another attendee was reluctant or hesitant to voice any criticism to Schwab.

Reacting to Hoffman's response, Kraus stated, "That's an indictment of management." Kraus and Schwab believe that Hoffman's comment had a negative effect on the mood of the sales meeting. Hoffman believes that Schwab created a negative mood at the meeting by announcing the termination of an employee caught stealing in the Dallas office.

After the meeting, Schwab told Hoffman that Kraus took Hoffman's comment to be an indictment of management. Therefore, Hoffman sent Schwab a letter on June 27, 1994.

The letter acknowledged that Hoffman's response "apparently caused some animosity towards me." The letter further stated that Hoffman and Schwab should discuss the matter further "[if] after this letter [Schwab] still feels negative about" Hoffman's response. (Schwab Decl. ¶ 11.)

Schwab's affidavit states that Schwab determined that Hoffman's employment should be terminated based upon Hoffman's conduct at the June 1994 sales meeting, which was the culmination of several inappropriate acts by Hoffman. Schwab consulted with Kraus on the issue, and Kraus concurred in the determination.

Accordingly, at Schwab's instruction, Kraus informed Hoffman that MCA would no longer require him to perform services under his employment agreement. Kraus told Hoffman that the termination stemmed not from poor sales performance, but rather from Hoffman's disrespectful attitude towards MCA management.

Hoffman was 54 years of age at the time of his termination. He was the highest paid sales representative at his level of management and some of his un-vested stock options would have vested, if MCA had renewed his contract. After being discharged from another company for poor performance, Hoffman currently sells television programming for another company, Orion Television.

The day MCA terminated Hoffman, they offered Hoffman's position to a thirty-three year old sales representative, Michael Howard ("Howard"). Howard refused the offer because MCA would not meet his salary demands. Thereafter, MCA replaced Hoffman with a thirty-seven year old sales representative.

Hoffman alleges that Kraus made several age-related statements to Hoffman during Hoffman's employment, including the following.

Hoffman testified that, about 1990, Kraus told Hoffman that Kraus thought Al Strada ("Strada"), an "older" salesman, was an "old fashioned hack salesman" and that Kraus was going to get Strada out of MCA. MCA later terminated Strada. (Hoffman Dep. at 203–04.) Kraus testified that he had no rec-

ollection of using the expression, "old fashioned hack salesman," in reference to anyone, and that he did not harbor a desire to get rid of Strada.

Hoffman testified that, in 1991, after Hoffman commented that his back was bothering him, Kraus stated, "You're just getting old." Hoffman also testified that, in 1991, while Kraus was out to dinner with Hoffman, Kraus repeated, "Paul, you're just getting old." However, Hoffman does not complain of any remarks in 1992 or 1993. Hoffman testified, that in 1994, Kraus stated at a business dinner with Hoffman, "Paul, you're just getting old." Hoffman further testified that, at a second business dinner in 1994, Kraus said, "Hey, you're just getting old" in response to Hoffman's comment that he needed better glasses because he was having a hard time reading the menu. Kraus did not recall making any comments about Hoffman's age.

Hoffman testified that, at the first 1994 business dinner, Kraus also asked Hoffman when he was going to retire. Kraus denied asking Hoffman when he was going to retire, but stated that Kraus and Hoffman discussed Hoffman's long term life plans.

Finally, Hoffman testified that, after the second 1994 business dinner, Kraus stated in the parking lot, "I think we're going to have to get fresh legs in Chicago."

## II. DISCUSSION

The ADEA makes it an unlawful employment practice for an employer to discriminate against an employee at least forty years old because of the employee's age. 29 U.S.C. §§ 623(a) & 631(a). MCA now moves for summary judgment, arguing that Hoffman cannot demonstrate that it discriminated against him because of his age.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

When considering all the evidence presented in a motion for summary judgment, a court cannot make credibility determinations nor can it choose between competing possible inferences. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253–55, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Accordingly, "if the evidence presented by the parties is subject to conflicting interpretations, or if reasonable minds could differ as to its significance," summary judgment must not be granted. *O'Connor v. Chicago Trans. Auth.*, 985 F.2d 1362, 1366 (7th Cir.1993). The court must "view the record and all reasonable inferences drawn from the record in the light most favorable to the non-moving party." *Sample v. Aldi Inc.*, 61 F.3d 544, 546 (7th Cir.1995). The summary judgment "standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir.1993).

Yet, these rules do nothing to alter the burden of proof. "If the non-moving party bears the burden of proof on an issue, that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact." *Sample*, 61 F.3d at 547. The Seventh Circuit has established that "self-serving affidavits without factual support in the record will not defeat a motion for summary judgment." *Unterreiner v. Volkswagen of Am., Inc.*, 8 F.3d 1206, 1210 (7th Cir.1993) (quoting *Slowiak v. Land O'Lakes. Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993)). A plaintiff in an age discrimination case bears the ultimate burden of proving that an adverse employment decision was intentionally taken against him because of his age.

"The question ... is whether the plaintiff has established a logical reason to believe that the decision rests on" age. *Doe By Doe v. City of Belleville, Ill.*, 119 F.3d 563, 585–86 (7th Cir.1997). The court notes that Hoffman "need not demonstrate that age was the sole reason for discharge," rather he must show that age was a "determining factor."

*Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919 (7th Cir.1996).

The court must review MCA's termination decision under the summary judgment standard and determine whether there are any questions of fact which would allow the case to proceed to trial. In reviewing MCA's decision, the pertinent question is not whether MCA was right to believe that Hoffman should be terminated because he was a bad employee, but rather whether that belief was genuine. *Willis v. Marion County Auditor's Office*, 118 F.3d 542, (7th Cir. 1997). Whether MCA was correct in its conclusion is immaterial. *Id.* As the Seventh Circuit has often repeated, the court does not act as a super-personnel panel, second-guessing business decisions, even when those decisions are wrong, provided that the basis for those decisions is not discriminatory. *Bahl v. Royal Indemn. Co.*, 115 F.3d 1283, 1291–93 (7th Cir.1997).

Hoffman may proceed with his case via either direct evidence or the burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

> "Direct evidence is 'evidence which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption.' . . . This evidence 'must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question.'"

*Cowan v. Glenbrook Security Servs., Inc.*, No. 96–3897, 1997 WL 409404, at *4, 123 F.3d 438, 443 (7th Cir. July 23,1997) (citations omitted). To constitute direct evidence of discrimination, "a statement must relate to the motivation of the decision maker responsible for the contested decision." *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 203 (7th Cir.1996).

■ Hoffman contends that Kraus' various age-related remarks constitute direct evidence of age discrimination. The court disagrees. Unlike the age-related remarks in the cases cited by Hoffman, Kraus' alleged remarks do not indicate an opinion that "older" individuals should stop working or be terminated. *See DeBuhr v. Olds Prods. Co.*, No. 95 C 1462, 1996 WL 277644 (N.D.Ill. May 22, 1996) ("people should quit what they are doing when they are 58 years old"); *Ormiston v. Penton Corp.*, No. 93 C 3485, 1995 WL 729296 (N.D.Ill.Dec.6, 1995) ("older guys can't do new tricks" in combination with "the older guys have to be replaced"). In contrast to those cases, Kraus' comments (regarding Strada, "getting old," and "fresh legs") do not directly indicate a desire to terminate older individuals. They are not the "smoking gun" type of evidence which can be classified as "direct." Without reliance on inference or presumption, the remarks do not lead to the conclusion of age discrimination against Hoffman. Thus, they cannot be considered direct evidence of age discrimination.

Thus, the court turns to analysis of Hoffman's case under the *McDonnell Douglas* burden-shifting method. Once Hoffman establishes a *prima facie* case of age discrimination, the burden shifts to MCA, to produce legitimate, non-discriminatory reasons for its actions. *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1141–42 (7th Cir.1997). If MCA has met its burden, the burden shifts back to Hoffman to demonstrate that MCA's proffered reasons are pretext for discrimination. *Id.*

■ To establish a *prima facie* case of age discrimination, Hoffman must show that (1) he was over forty years of age; (2) he performed to MCA's legitimate expectations; (3) he experienced an adverse employment decision; and (4) similarly situated younger[6] employees were treated more favorably. *See Senner v. Northcentral Tech. College*, 113 F.3d 750, 754 (7th Cir.1997); *Rabinovitz v. Pena*, 89 F.3d 482, 486 (7th Cir.1996). Once Hoffman establishes his *prima facie* case, MCA must come forward with a legitimate, non-discriminatory reason for its treatment

---

**6.** The court notes that, in age discrimination cases, the similarly-situated employees need not be outside the protected class (i.e., they need not be younger than the plaintiff); rather, they should simply be younger. *See O'Connor v. Con-* *solidated Coin Caterers Corp.*, 517 U.S. 878, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996); *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 864 (7th Cir.1996).

of Hoffman to avoid liability. *See Gleason,* 118 F.3d at 1141–42.

■ The court finds that Hoffman has not met the requirements of a *prima facie* case. He was over forty years of age. At least in the performance (as opposed to personality) aspects of his job, Hoffman has demonstrated that he performed satisfactorily: he was the leading salesperson at MCA at the time of his termination.[7] Termination is an adverse employment action.

However, Hoffman has produced no evidence that similarly-situated younger employees were treated differently. Again, Hoffman attempts to compare the treatment he received to that received by other sales representatives. Those sales representatives held positions of lower authority than Hoffman. Hoffman was not an ordinary sales representative; he was a Vice President/Midwest Regional Manager with over fifteen years of experience with MCA. He produces no evidence of anyone similarly-situated, much less evidence that any such individual was treated differently. *See Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035 (7th Cir.1993). Accordingly, Hoffman has not demonstrated that he was treated differently than younger individuals.

Alternatively, assuming *arguendo* that Hoffman has demonstrated a *prima facie* case, the court continues with the burden-shifting analysis. After the *prima facie* case, the burden shifts to MCA to produce, not prove, a legitimate, non-discriminatory motive for its adverse employment action against Hoffman. *Gleason,* 118 F.3d at 1141–42. For purposes of summary judgment, Hoffman concedes that MCA has met its burden of production. That is, MCA states that it terminated Hoffman based on his history of disruptive conduct and disrespect of management, as well as for his conduct at the June 1994 sales meeting.

Because MCA has met its burden of producing a legitimate, non-discriminatory motive for terminating Hoffman, the burden

shifts back to Hoffman to prove that the proffered explanation is pretextual. *Id.* "An employee may establish pretext indirectly by proving one of the following: '(1) [the d]efendant's explanation had no basis in fact, or (2) the explanation was not the "real" reason, or (3) ... the reason stated was insufficient to warrant the [adverse job action].'" *Johnson v. City of Fort Wayne,* 91 F.3d 922, 931 (7th Cir.1996) (citations omitted). Hoffman must be able to show that MCA's proferred reasons are "a lie, specifically a phony reason" for Hoffman's termination. *Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir. 1995).

As evidence of pretext, Hoffman offers only the several statements, made over four years, of one individual, Kraus. While considering the entirety of the evidence for purposes of summary judgment, the court will analyze those statements one-by-one.

■ First, Hoffman states that, in 1990, Kraus called Strada an "old fashioned hack salesman" and stated that he wanted to get rid of Strada. The court notes that the term "old fashioned" does not refer to age. Rather, it refers to either a mixed alcoholic drink or to one who is "[o]f a method or style formerly in vogue: outdated[;] ... Attached to or favoring customs, ideas, or methods of an earlier time." *Webster's II New Riverside Univ. Dictionary* 818 (1988). Kraus's alleged comment does not connote age discrimination, but rather a dislike of Strada's style.

Further, Kraus directly denied making the comment or harboring any desire to terminate Strada. The court notes again, "self-serving affidavits without factual support in the record will not defeat a motion for summary judgment." *Unterreiner v. Volkswagen of Am., Inc.,* 8 F.3d 1206, 1210 (7th Cir.1993) (quoting *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295 (7th Cir.1993)).

■ Next, Hoffman testified that Kraus thrice stated that Hoffman was "getting old,"

---

7. The court notes that certain personality/compatability aspects may be part of an employer's legitimate job expectations, provided they are objectively reasonable and communicated to the employee. *See Mills v. First Fed. Sav. & Loan Ass'n of Belvidere,* 83 F.3d 833, 843 n. 7 (7th

Cir.1996). However, for purposes of summary judgment, drawing all inferences in the light most favorable to Hoffman, the court will assume, *arguendo,* that Hoffman has demonstrated the performance prong of a *prima facie* case.

twice in response to Hoffman's complaints about his back and eyes. When made in response to traditionally age-related medical complaints, Kraus' comment amounts to nothing more than a truism: Hoffman was aging. The comments indicate that Kraus was aware that Hoffman was aging; they do not indicate that Kraus did not consider Hoffman a good employee because of that aging.

■ Then, Hoffman alleges, at the first 1994 business dinner, Kraus asked Hoffman when he was going to retire. As the Seventh Circuit has recognized, employers have a legitimate business interest in determining when their executives intend to retire; "it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct." *Colosi v. Electri–Flex Co.*, 965 F.2d 500, 502 (7th Cir.1992). As such, the court cannot consider the alleged inquiry as indicating age bias. Further, although admitting that they discussed Hoffman's long term life plans, Kraus denies that he ever asked Hoffman when he was going to retire.

■ Finally, Hoffman testified that, after the second 1994 business dinner, Kraus stated in the parking lot, "I think we're going to have to get fresh legs in Chicago." Like the other comments, and in light of the nature of Hoffman's entire relationship with MCA, the "fresh legs" comment does not connote age discrimination. Assuming, as the court must at summary judgment, that the comment related to hiring younger individuals, it is not reasonable to infer that the comment related to firing Hoffman. There were several sales representatives in the Chicago office, and Kraus in no way implied that any of them, much less Hoffman, would have to clear the way for "fresh legs."

Additionally, this single isolated comment is not enough to connote age discrimination against Hoffman, nor is there a reasonable inference of such discrimination even when considering all of the alleged isolated comments. "To be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision-making process." *Gleason*, 118 F.3d at 1140. (citation omitted); *see also Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1265 (7th Cir.1993) (stating that evidence of stray remarks, "without more, does not give rise to an inference of discrimination"). The alleged comments were not at all contemporaneous with, nor can Hoffman show that they are causally related to, the discharge decision-making process.

Further, there must be a connection between alleged discrimination and the makers of adverse employment decisions. "[W]hen the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissible basis, the bias of the subordinate is not relevant." *Willis v. Marion County Auditor's Office*, 118 F.3d 542 (7th Cir. 1997). Even assuming, that Kraus was the ultimate decisionmaker, an allegation for which Hoffman produces no support, the court would have difficulty in connecting his few comments to the termination decision. *See DeBuhr*, 1996 WL 277644 at *3 ("Evidence of a decision maker's occasional or sporadic derogatory remarks about an employee's age is generally, without more, insufficient to establish an ADEA claim").

Without support, Hoffman attributes the entire termination decision to Kraus. Indeed, at his deposition, Hoffman admitted that he believed that Schwab, MCA's president and Hoffman's elder, made the ultimate termination decision. Although Kraus supported concurred in the decision, there is no evidence that Kraus initiated it. Indeed, Schwab renewed Hoffman's contract in 1991, despite Kraus' memoranda and Kraus' recommendation to the contrary. The only reasonable inference is that, at least in 1991, Schwab was the ultimate decisionmaker.

The record directly indicates that Schwab based the decision on Hoffman's statement to Schwab at the June 1994 meeting, which Schwab perceived questioning upper management and an intentional attempt to embarrass him. Hoffman has not demonstrated otherwise.

MCA has demonstrated that Schwab terminated Hoffman for his attitude toward management, problems dealing with television stations, and his behavior at the June 1994 meeting. It is clear that Schwab consulted Kraus on the decision. It is also clear that Kraus wanted to fire Hoffman.

However, Hoffman has not raised a reasonable inference that Kraus wanted to fire Hoffman because of his age, or that MCA did fire Hoffman because of his age. Hoffman has not produced evidence, beyond his own opinions in his deposition testimony and affidavit, that MCA's proferred reasons for terminating him are pretextual. *See Russell v. Acme–Evans Co.*, 51 F.3d 64, 69 (7th Cir. 1995) ("The fact that some of the [employer's proferred reasons for termination] may be called into question by [the employee's] deposition or affidavit does not defeat summary judgment if at least one reason … stands unquestioned. "); *see also Spring v. Sheboygan Area School Dist.*, 865 F.2d 883, 886 (7th Cir.1989) (noting that courts are not required to "draw every conceivable inference" in favor of plaintiffs, but "only the reasonable ones"). It is not for the court to second-guess the decision of MCA in the absence of evidence of pretext.

### III. CONCLUSION

Hoffman has not offered direct evidence of discrimination. He has not established a *prima facie* case of discrimination. He has not established that MCA's proferred reason for terminating him is pretextual. Thus, the court grants summary judgment in favor of MCA.

IT IS SO ORDERED.