James P. ROBERTS, Plaintiff,

v.

David BROSKI, individually and in his official capacity as interim Chancellor of the University of Illinois, a body politic and an Illinois corporation, Defendant.

No. 96 C 1749.

United States District Court, N.D. Illinois, Eastern Division.

Oct. 3, 1997.

Lester Lloyd Barclay, Lauren Blair, Elise Dixon, Barclay & Dixon, P.C., Chicago, IL, for Plaintiff.

Carla Joanne Rozycki, Jenner & Block, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

This matter is before the Court on Defendant David Broski's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

Motion granted.

### I.  BACKGROUND [1]

The University of Illinois at Chicago ("UIC") has an Urban Health Program ("UHP").  The purpose of the UHP is to expand the enrollment, retention, and graduation of minority students.  Each of the health profession colleges—which includes

**1.** The parties have submitted voluminous facts. The court's background section focused on the "facts" necessary to provide a general account concerning this dispute.

the College of Dentistry—within the UIC has personnel employed to maintain the objectives of the UHP. The UIC also created a Community Advisory Council ("CAC") to assist the UHP efforts.

Plaintiff James Roberts began his employment with the UIC in 1983 as an Assistant Dean for Administration in the College of Dentistry. Roberts also has significant responsibilities pertaining to the UHP—his position has been referred to as the Director of the UHP and as the UHP Coordinator in the College of Dentistry. His duties included the recruitment, retention, and graduation of minority students. Roberts was assisted in his UHP responsibilities by Oscar Martinez.

The size of the entering class of the College of Dentistry has generally been declining over the years. From its inception, the UHP set a goal of 15% minority representation in the College of Dentistry. The College of Dentistry reached the 15% goal once—in 1990. From 1991 to 1995 the minority representation of the entering classes was low and declining steadily. In fact, from 1981 through 1994, with the exception of 1990 through 1993, the College of Dentistry had the lowest percentage of minority representation of the six health profession colleges. The College of Dentistry also had the lowest percentage of total graduates of the six health profession colleges from June 1982 through June 1994.

Dr. Allen Anderson has been the dean of the College of Dentistry since 1988. As dean, he is the chief executive officer and administrator of the College of Dentistry. In 1992, 1993, and 1994., Dean Anderson advised Roberts that he would be receiving below average salary increases due to the low UHP student enrollment.

Beginning with the 1993–94 academic year, Dean Anderson prepared written evaluations of Roberts' performance. Simply stated, the 1993–94 and 1994–95 evaluations did not speak highly of Roberts' performance.

In September of 1994, Dean Anderson and Roberts met to discuss his evaluation regarding his performance for the 1993–94 academic year. Dean Anderson was very upset due to the low UHP enrollment numbers in the College of Dentistry. Roberts claimed that the low enrollment was the result of an insufficient budget regarding recruitment efforts.

Dean Anderson requested a report from Roberts (and his assistant Martinez) in March of 1995 detailing their UHP plans and goals for the upcoming year. The report was submitted, but Dean Anderson criticized it.

The CAC held a meeting on January 25, 1995. Defendant David Broski—at the time the Interim Chancellor at UIC; currently the Chancellor at UIC—was present. Concern was expressed regarding the fact that no African–American students were part of the 1994 entering class. Roberts responded to the concern by noting that scholarship money disappeared and there was a national crisis—thirty of the fifty six dental schools in the country lacked African–American students for the 1994 entering class.

At the meeting, the UHP budget information was discussed. Roberts questioned the accuracy of some of the figures, suggesting—at least implicitly—that the numbers, for whatever reason, had been fabricated. Roberts also complained of insufficient funds for recruitment activities.

The January 1995 meeting was not the first time Roberts questioned the accuracy of the figures comprising the budget. In May of 1990, Roberts complained at a CAC meeting that a report of UHP expenditures was inaccurate.

In early June of 1995, another CAC meeting was held. Broski was present. The UHP budget was discussed. Roberts once again questioned the numbers, noting that the numbers were "bitching," "did not make sense," and "did not add up." Broski was admittedly disturbed by Roberts' comments; he found the "serious charges" that the budgeting committee "created out of whole cloth some fictitious numbers" offensive.

Accordingly, to dispel questions regarding the accuracy of the budget, the CAC recommended a review of the budget allocations. A minority owned outside accounting firm was utilized. The court was not informed of the conclusions reached by the accounting firm.

Shortly after the CAC meeting in June of 1995, Dean Anderson learned that no African–Americans and only three Hispanic students were admitted to the College of Dentistry's 1995 entering class. This was the second successive year in which no African–Americans were admitted to the first year dental class. Consequently, Dean Anderson recommended to Broski that Roberts be issued a terminal contract.

That was the third consecutive year that Dean Anderson recommended to Broski that Roberts be issued a terminal contract. In the prior two years, Broski rejected Dean Anderson's recommendation. This was the third strike, however; Broski now agreed with Dean Anderson's decision. On August 17, 1995, a terminal contract dated August 15, 1995, was issued to Roberts for the 1995–96 academic year with notice that the contract would not be renewed at the end of its term. The College of Dentistry Executive Committee unanimously concurred with the decision to issue Roberts a terminal contract.

Roberts responded by filing a formal grievance against Broski and Dean Anderson—and also Donald Rice, the Associate Dean for Student Affairs in the College of Dentistry. The Court was not informed of the result of the grievance hearing; though, it appears things did not go as Roberts had hoped. Indeed, in November of 1995, Roberts filed an action in the Circuit Court of Cook County against Broski, Dr. Manning—the grievance officer—and Mary Beastall—the grievance hearing officer. Roberts claimed that the handling of the grievance "violated his rights."

In March of 1996, Roberts filed the instant action in federal court claiming that his termination was in retaliation for his comments regarding the UHP budget allocations and the accuracy of the UHP reports at the January and June 1995 CAC meetings.

**2.** Originally, Roberts also had a retaliatory discharge claim under state law. The court dismissed that claim, however.

**3.** To establish a viable § 1983 claim, Roberts must prove (1) that the conduct complained of was committed by a person acting under color of state law and (2) that the conduct deprived him

The matter is before the Court on Broski's motion for summary judgment.

## II. *SUMMARY JUDGMENT— STANDARD OF REVIEW*

Under FED. R. CIV. P. 56(c), summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Black v. Henry Pratt Co.*, 778 F.2d 1278, 1281 (7th Cir.1985). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Unquestionably, in determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Howland v. Kilquist*, 833 F.2d 639 (7th Cir.1987).

## III. *DISCUSSION*

In the only count of the complaint,[2] Roberts claims that he was issued the terminal contract, *i.e.*, fired, as a result of his comments regarding the accuracy of the numbers in the budget. That, he claims, violated his First Amendment right of freedom of speech. Thus, he initiated this claim against Broski in both his individual and official capacities pursuant to 42 U.S.C. § 1983.[3]

of rights, privileges, or immunities secured by the Constitution or laws of the United States. *New Burnham Prairie Homes v. Village of Burnham*, 910 F.2d 1474, 1479 (7th Cir.1990). The parties agree that Broski acted under color of state law; thus, the issue is whether Roberts' First Amendment rights were violated.

Broski attacks each aspect of Roberts' claim. First, he argues that Roberts' comments should not receive First Amendment protection; second, he argues that even if the comments were protected, the UIC's interest outweighed Roberts' interest in the speech; next, Broski argues that Roberts' speech was not the motivating factor for his termination, rather, his poor performance was the reason; finally, he argues that, if all else fails, he is entitled to qualified immunity in his individual capacity. Each wave of Broski's attack will be addressed in turn.

## A. *First Amendment Protection*

■ "The First Amendment's guarantee of freedom of speech protects government employees from termination *because of* their speech on matters of public concern." *Board of County Comm'rs, Wabaunsee County, Kansas v. Umbehr,* — U.S. —, —, 116 S.Ct. 2342, 2347, 135 L.Ed.2d 843 (1996). Accordingly, the first question in determining whether the speech receives First Amendment protection with respect to government employment inquires as to whether the speech addressed a matter of public concern. *See Cliff v. Bd. of School Comm'rs of the City of Indianapolis, Indiana,* 42 F.3d 403, 409 (7th Cir.1994). Matters of public concern are "matters in which the public might be interested, as distinct from wholly personal grievances...."[4] *Dishnow v. School Dist. of Rib Lake,* 77 F.3d 194, 197 (7th Cir.1996).

■ The question of whether speech is on a matter of public concern is one of law for the court to decide. *Campbell v. Towse,* 99 F.3d 820, 826 (7th Cir.1996). In answering that question, the court will focus on the "content, form and context" of the speech as revealed by the record as a whole, with content being the most important factor. *Cliff,* 42 F.3d at 409. The employee's motive underlying the speech is relevant, but not dispositive. *Id.* But, generally speaking, if the employee is speaking to further a private

interest, his argument that the speech implicates a matter of public concern is weakened. *See id.* at 410.

### 1. The comments

■ To begin, the court must interpret Roberts' comments—what was he alleging? At the January 1995 budget meeting, Roberts questioned the accuracy of the numbers in the budget. He used language like: the "figures are not only wrong, but grossly wrong;" the documents we looked at "do not match up at all with what you are showing up there right now;" if you checked with the business office, the College of Dentistry "would not show $91,300 ... it would show $87,300 only;" and "some of the numbers are grossly in error and I think we need to find out what's going on."

At the June 1995 budget meeting, the numbers were again questioned. Roberts said: "some of us do have some problems" with the numbers; we "have some very real problems with what we're looking at right now;" "these numbers are bitching;" "these numbers don't make sense;" "these numbers don't add up;" and some of the individual names in the budget "we have never seen them, we don't know who they are, we have no idea who they are, where they are, what they have been doing."

Now, both parties agree that if Roberts was alleging the misuse or illegal use of public funds a matter of public concern would be implicated. *See Colburn v. Trustees of Indiana Univ.,* 973 F.2d 581, 586 (7th Cir. 1992) ("exposing wrongdoing within a public entity may be a matter of public concern."). But, is that what Roberts was alleging? Broski doesn't think so. Broski argues that Roberts merely questioned the accuracy of the budget and never asserted misappropriation, malfeasance, fraud, or anything that would suggest something illegal or improper was afoot. Roberts disagrees, he claims that he was alleging potential illegal or improper

---

**4.** Personal grievances, in a broader sense, may certainly receive First Amendment protection. In the context of employment relationships, how-

ever, such grievances are viewed as too remote from the central concerns of the First Amend-

expenditures by a public entity.[5]

■ The court, granting Roberts the benefit of reasonable inferences, sides with Roberts.[6] Roberts spoke of numbers that were "grossly" erroneous. Gross errors—as opposed to minor, trivial errors—imply something is amiss—something more than just mathematical errors. Moreover, Roberts also spoke of individuals on the budget who were unknown to not only him, but others. Funds being allocated to unknown individuals certainly suggests something illegal or highly improper.

Furthermore, Broski apparently interpreted the comments as suggesting something grossly improper on his part. In response to Roberts' comments at the June 1995 meeting, Broski stated "these are very serious charges that we've king of created out of whole cloth some fictitious numbers and frankly I'm offended at that...." Thus, certainly Broski thought the comments involved "very serious" allegations of improper conduct. Accordingly, the court finds that Roberts' comments pertained to the misuse or illegal use of public funds.

## 2. The motive

■ Next, Broski argues that even if Roberts was suggesting that funds were misused or misappropriated, he was doing it for private, personnel reasons and not to air the allegations to the public; thus, the comments should not receive protection. In support of his position, Broski notes that Roberts certainly was aware that his performance was being criticized by superiors, *i.e.*, he knew his job was on the line. And, Roberts was already making excuses for his performance by complaining frequently that the budget was

insufficient, thus, he lacked the funds to recruit qualified minorities. Accordingly, his attack on the numbers of the budget was nothing more than a preemptive strike—he was going to get them before they got him. Such a preemptive attack would make any adverse employment decision directed at him look like it was retaliatory in nature.

That may be true. Broski's argument that Roberts made the comments as part of his preemptive strike, however, is nothing but speculation. Broski wants the court to conclude as a matter of law that the comments were made for purely private interests. The court can't do that. There is no evidence in the record of that, other than Broski's speculation. Furthermore, as noted in footnote 6, Broski offers no argument that Roberts made the comments with reckless disregard for the truth; thus, there must have been a legitimate factual basis underlying the comments—how could the court presume otherwise?

Assuming Roberts had a "non-reckless" basis to make the allegations, he was potentially blowing the whistle on public employees' misuse of funds. Certainly the public would want to know if that was the case. *See Eberhardt v. O'Malley,* 17 F.3d 1023, 1026 (7th Cir.1994). And, because his concerns were aired at the budgeting meeting—in front of numerous people affiliated with the UIC—it appears Roberts desired to expose his concerns to the public.

The bottom line is this: the court simply cannot conclude that Roberts' comments were made for purely private interests. Perhaps they were, but the evidence for that is lacking.[7] If the court ruled that way, the

---

ment to justify judicial interference with the employment relationship. *Dishnow,* 77 F.3d at 197.

**5.** In Broski's motion, he claims that Roberts "expressly disclaimed any such accusation" regarding the illegal or improper use of public funds. Broski cites no evidence in support of that statement. Nor could the court locate any such statement from Roberts in the statement of uncontested facts.

**6.** At this point, the court deems it appropriate to note that the analysis of this case presumes that Roberts had a reasonable basis to make the allegations, whatever that basis was. Fabrications

or speech made with reckless disregard for the truth do not receive First Amendment protection. *See Brenner v. Brown,* 36 F.3d 18, 20 (7th Cir. 1994). Since there is no argument that Roberts' comments were made with reckless disregard for the truth, the court presumes that the comments were supported by a "legitimate" factual foundation.

**7.** Keep in mind, motive is not dispositive, it is just a factor to consider. The fact that Roberts had a personnel interest in expressing the views does not necessarily remove his speech from First Amendment protection. *See Campbell,* 99 F.3d at 827.

Court would merely be agreeing with Broski's speculation. The fact that Broski offers no argument that Roberts' accusations were baseless or made with reckless disregard for the truth indicates to the court that Roberts' accusations were perhaps grounded in fact—certainly, the court cannot conclude that they were made with reckless disregard for the truth. The potential social significance of Roberts' comments—exposing misuse of funds—greatly outweighed any purely private vendetta Roberts may have had with Broski and others. *See Eberhardt,* 17 F.3d at 1026.

Accordingly, the court finds that First Amendment protection is still available. On to the next wave of attack.

## B. *The UIC's Interest vs. Roberts' Interest*

■ Next, Broski argues that even if the speech is protected, Roberts' interest in the speech is outweighed by the UIC's interest in promoting the efficiency of the public services it performs through its employees—the *Pickering v. Bd. of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), balancing test—thus, his termination was justified. *See Umbehr,* —— U.S. at ——, 116 S.Ct. at 2347 ("And even termination because of protected speech may be justified when legitimate countervailing government interests are sufficiently strong."); *Campbell,* 99 F.3d at 828–829 (discusses factors court should consider).

The court need not devote much time to this argument—indeed, Broski devoted only approximately one page to it. Consistent with his other arguments, Broski's argument here appears to be premised on the ground that Roberts' comments did not involve allegations regarding the misuse or illegal use of funds. As the court held earlier, however, that is not the case. Since that is not the case, Broski's argument is misplaced. The court cannot conceive of how an employee's potential whistle-blowing could be outweighed by a UIC interest.

## C. *The Reason For Termination*

In his next wave of attack, Broski argues that Roberts' speech was not a substantial or motivating factor for his termination; rather, Broski claims that Roberts was terminated as a result of his poor performance. *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The court agrees with Broski.

### 1. Motivating factor

■ In *Mt. Healthy,* the Supreme Court held that the plaintiff complaining that he was terminated as a result of protected speech must establish—by a preponderance of the evidence—that the speech was a "substantial factor" or the "motivating factor" in the termination decision. *Id.* at 287, 97 S.Ct. at 576; *see Gooden v. Neal,* 17 F.3d 925, 928 (7th Cir.1994) (discussing *Mt. Healthy* ). Until the plaintiff can establish—by a preponderance of the evidence—that his speech was the motivating factor for the adverse employment action, the defendant does not have to show a legitimate reason for the adverse action. *Cromley v. Bd. of Educ. of Lockport Township High Sch. Dist.,* 17 F.3d 1059, 1068 (7th Cir.1994).

How is the plaintiff to establish this, though? The Seventh Circuit hasn't provided much guidance in this area. They have stated, however, that "the mere fact that protected speech precedes an employment decision does not create the inference that the speech motivated the employment decision." *O'Connor v. Chicago Transit Auth.,* 985 F.2d 1362, 1368 (7th Cir.1993). Thus, the fact the Roberts' speech at both the January and June 1995 meetings preceded the mid–June 1995 decision to issue him a terminal contract doesn't do much for his case.

■ The Seventh Circuit also held that evidence of disagreement or dislike between the parties is not enough. *See Rakovich v. Wade,* 850 F.2d 1180, 1191 (7th Cir.1988). Rather, there must be some form of evidence linking the speech to the adverse employment action. *Id.* "Mere speculation" will not suffice. *Id.* Based on the evidence discussed

by Roberts, the court finds that he has not come forward with enough evidence to establish—by a preponderance of the evidence—a link between the issuance of the terminal contract and his comments at the January and June 1995 CAC meetings; rather, it appears he relies on nothing more than speculation.

Roberts offers four pieces of evidence in his attempt to establish the causation link. First, he notes that at the January 1995 meeting he questioned the accuracy of the numbers represented in the budget. That evidence doesn't do much for establishing a link between the speech and the issuance of the terminal contract. As noted above, the fact that the speech preceded the adverse action does not, by itself, create the inference that the speech motivated the action.[8] Similarly, for his second piece of evidence, Roberts notes that he was issued the terminal contract shortly after he again questioned the accuracy of the numbers at the June 1995 meeting. Once again, so what. That evidence, by itself, doesn't do much to establish the causation link.

▆▆ Next, Roberts says that on the same date as the January 1995 meeting, Dr. Wallace—the former Executive Director of the UHP—heard Broski threaten to fire Roberts if he spoke at the CAC meeting. Such evidence would certainly help Roberts in his attempt to establish the causation link, but, Roberts failed to cite the court to that evidence. *See Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 922 (7th Cir.1994) (it is the parties' responsibility to highlight factual averments and cite the record evidence to confirm the fact; "district courts are not obliged in our adversary system to scour the record"). It doesn't appear that such evidence exists within the trial record. Accordingly, the court ignores it.

For his final piece of evidence, Roberts notes that after he spoke at the January 1995 meeting, Broski questioned whether there needed to be two UHP coordinators in the College of Dentistry—remember, Roberts was assisted by Martinez. Roberts interprets Broski's comment as an implicit threat of termination due to Roberts' questioning of the budget. The other interpretation, however, is that because Roberts was complaining of a national crisis in minorities seeking to attend dental school and an insufficient budget for recruiting minorities, perhaps only one coordinator was necessary (since there were not many individuals interested in attending dental school anyway) and the extra money could be used for recruitment activities (since, as Roberts claimed, there were insufficient funds set aside for this purpose).

Perhaps Roberts' interpretation of Broski's remark bolsters his attempt to link his speech with the terminal contract, but, the court questions Roberts' interpretation. Keep in mind, on summary judgment the court must draw only *reasonable* inferences in favor of the nonmoving party. *See Bahl v. Royal Indem. Co.,* 115 F.3d 1283, 1289 (7th Cir.1997). To suggest that Broski was essentially telling Roberts to keep his mouth shut regarding the numbers in the budget or his position would be eliminated is too far a stretch for this court.

If Roberts was complaining that minorities—on a national scale—were not interested in attending dental school and enrollment was steadily declining—for both minorities and non-minority individuals—it seems very reasonable to the court for one to question whether two coordinators were thus required.[9] Wouldn't it be a better use of the

---

**8.** The fact that Roberts was issued the terminal contract approximately six months after his speech at the January 1995 meeting suggests that his comments at that particular meeting had nothing to do with his termination. A six month lapse of time is a long time. If his speech at the January meeting was the culprit, why did it take so long for the issuance of the terminal contract? *See O'Connor,* 985 F.2d at 1370 (discussing relevance of lapse of time and noting that in *McClure v. Cywinski,* 686 F.2d 541, 546 (7th Cir.1982), a lapse of time of 3 1/2 months between the speech and the termination "severely undercuts" the plaintiff's case). Perhaps the court should be focusing only on the comments at the June 1995 meeting.

**9.** Furthermore, since Roberts had an assistant below him, it seems that Martinez—as the assistant—should have been the one worried about his job. There is no indication by Broski that he was contemplating terminating Roberts. He merely questioned whether two positions were necessary.

funds to eliminate one position and use the additional funds for recruitment efforts to attract the most qualified interested minorities? That's good business; and, where better to raise such issues than at a budget meeting. Furthermore, after Broski's remark, he indicated that he was just considering his options and that he would discuss it with the Budget Advisory Committee. Accordingly, the court expresses grave doubts that Roberts' interpretation of Broski's remark is accurate.

Thus, the court must conclude that Roberts failed to link his speech with the termination decision. In summary, the fact that his speech preceded the termination decision is of nominal value; the statement by Dr. Wallace is nonexistent in this record; and because of the highly speculative—and unreasonable in this court's opinion—interpretation advanced by Roberts regarding the final piece of evidence, the court finds that he has not come forward with enough evidence to establish by a preponderance of the evidence that his speech was the motivating factor pertaining to his termination. Simply stated, it's not enough to satisfy his burden.

### 2. Job performance

■ Even if Roberts could establish that his speech was the motivating factor for the issuance of the terminal contract, Broski could still escape liability by showing that the terminal contract would have been issued absent the protected speech. *See Umbehr,* —— U.S. at ——, 116 S.Ct. at 2347. Broski claims that Roberts was terminated because of poor performance; namely, Broski and others were not satisfied with Roberts' effort in attracting minorities to UIC's College of Dentistry. The court finds that the evidence supports Broski's argument.

It's clear that Roberts' superiors were not pleased with his performance regarding the recruitment of minorities to the College of Dentistry well before his speech at the January and June 1995 CAC meetings. In 1992, 1993, and 1994, Dean Anderson informed Roberts that he would be receiving below average salary increases due to low minority enrollment. Furthermore, Dean Anderson's evaluations of Roberts were not promising.

The final straw came when Dean Anderson learned that for the second year in a row no African–Americans were admitted to the first year dental class. Moreover, 1995 was the third consecutive year that Dean Anderson recommended to Broski that Roberts be issued a terminal contract.

Roberts attempts to rebut allegations that he performed ineffectively regarding minority recruitment by noting that the low minority enrollment was the result of factors beyond his control. Factors which included primarily a national crisis of little interest, especially among minorities, for a career in dentistry and insufficient funds for recruitment activities. That may all be true. Nevertheless, Dean Anderson and Broski thought that Roberts should have performed better. This court is not in a position to question Dean Anderson and Broski's opinion regarding Roberts' recruitment efforts.

Next, Roberts claims that minority applicants for the 1993, 1994, and 1995 academic years actually increased; but, the vast majority of the applicants were rejected by the Admissions Committee. And, because he did not sit on the Admissions Committee, Roberts asserts that he lacked the power to admit the students. The court does not find Roberts' argument persuasive as to whether he was performing his UHP responsibilities effectively. Perhaps the majority of the applicants were rejected because they were not the caliber of students the UIC was seeking to attract.

Finally, to rebut Broski's claim that Roberts was terminated for poor performance, Roberts argues that the UHP activities only accounted for 25% to 55% of his responsibilities, but he was never evaluated on his non–UHP responsibilities. Once again, the court finds the argument unpersuasive as to whether Roberts was performing effectively. Broski and Dean Anderson believed that Roberts' main responsibility was to recruit minority students to the College of Dentistry. In their opinion, he did not perform effectively regarding his most important responsibility.

In summary, the court does not believe Roberts has come forward with enough evi-

dence to cast doubt on the reason asserted for Roberts' termination—poor job performance. Accordingly, Roberts' case would fall here, also.

## IV. CONCLUSION

The defendant's motion for summary judgment is GRANTED. Judgment is entered on behalf of the defendant, David Broski and against the plaintiff, James P. Roberts.[10]

10. The court finds no reason to discuss Broski's    qualified immunity or mitigation arguments.