186 F.3d 990 (7th Cir. 1999)
 JAMES P. ROBERTS, Plaintiff-Appellant,
v.
DAVID C. BROSKI, individually and in his official capacity as Interim Chancellor of the University of Illinois, a body politic and an Illinois corporation, Defendant-Appellee.
 No. 97-3600
 United States Court of Appeals, Seventh Circuit
 Argued November 10, 1998
Decided August 4, 1999
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 96 C 1749--James H. Alesia, Judge.
 Before COFFEY, MANION and ROVNER, Circuit Judges.
 ILANA DIAMOND ROVNER, Circuit Judge.
 
 
 1
 James P. Roberts served as the Assistant Dean for Administration in the College of Dentistry at the University of Illinois, Chicago (the "university" or "UIC") from 1983 through 1996, when he was terminated. Roberts filed suit against UIC's then-interim chancellor David Broski pursuant to 42 U.S.C. sec. 1983, alleging that Broski discharged him for publicly criticizing budgetary information concerning the university's efforts to recruit minority students. See Mount Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S. Ct. 568 (1977). The district court granted summary judgment in favor of Broski. Roberts v. Broski, 979 F. Supp. 746(N.D. Ill. 1997). Because we agree that Roberts failed to produce sufficient evidence that his public remarks were a substantial or motivating factor in his discharge, we affirm.
 
 I.
 
 2
 The UIC maintains an Urban Health Program ("UHP") designed to expand the enrollment, retention, and graduation of under-represented minority students in the university's six health professions colleges, which of course include the College of Dentistry (the "college" or "COD"). Roberts' duties as the college's assistant dean included (among others) recruiting minority candidates for enrollment in the COD. Roberts was also a member of the UIC management team and in that capacity attended meetings of the community advisory council ("CAC"), which cooperated with the UHP in its minority recruitment efforts. Oscar Martinez assisted Roberts with his UHP obligations.
 
 
 3
 The UHP has a target of fifteen-percent minority enrollment in each of the associated colleges, but after achieving that percentage in 1990, the COD experienced a subsequent drop in minority enrollment that left it well short of that goal. In 1991, 1992, and 1993, there were only one or two African Americans in the first- year classes, for example, and in 1994 and 1995 there were none. Roberts attributed the decline to a nationwide drop in dentistry enrollment and a lack of minority interest in dentistry, coupled with a shortage of grants and scholarships for minority students; but Dr. Alan Anderson, the college dean, was not convinced by his explanation and became dissatisfied with Roberts' recruitment efforts. Anderson's evaluations of Roberts for the 1993-94 and 1994-95 academic years were critical of his performance. Anderson also recommended to Chancellor Broski in both 1993 and 1994 that the university issue Roberts a terminal contract. On both occasions, however, Broski rejected the recommendation and instead asked Anderson to work with Roberts in an effort to improve UHP enrollment.
 
 
 4
 At a January 25, 1995 meeting of the CAC, Broski called for a reassessment of UHP expenditures to determine whether the best use was being made of the university's limited resources. Broski presented some preliminary data on the monies then being spent by each of the participating colleges and supporting units and indicated that he wanted these figures verified. He also proposed to create a small, volunteer budget advisory committee (comprised of CAC members) that would review these figures and recommend ways in which the existing funds could most profitably be spent to increase the recruitment and retention of minority students. In the discussion that ensued, Roberts expressed concern that some of the figures in Broski's preliminary report were "not only wrong, but grossly wrong." He also complained that the funds allocated to the COD were used entirely to fund the salaries paid to him and Martinez (Roberts' assistant), leaving no money for recruitment; Martinez echoed that view. Broski indicated in reply that this was exactly why he wanted a budget advisory committee to review the expenditures and to determine whether there were other ways of deploying the university's funds that might be more productive.
 
 
 5
 [T]hat underscores exactly what I am going to ask this budget advisory committee to do, because it seems to me the question that faces us is not a question of absolute dollars. We spend something like $12 million a year on this campus on the recruitment and retention of minority students campuswide, so the commitment--the commitment to the recruitment and retention of minority students campuswide is not--the financial commitment is not in question. The deployment of those resources, however, is. And maybe it's smarter for us to have one person in Dentistry with a bigger expense budget than it is to have two people in Dentistry with no expense budget. And I--now that's a very reasonable sort of thing to talk about. And that's the sort of thing I'm going to take up in the Budget Advisory Committee.
 
 
 6
 R. 76 para. 185. (The meetings of the CAC were tape recorded, which is why we are able to recount Broski's remarks verbatim.)
 
 
 7
 Pursuant to Broski's suggestion, a CAC budget advisory committee was formed, and that committee presented its report on current UHP expenditures to the CAC on June 8, 1995. The CAC accepted the report and resolved to form a temporary committee that would, in cooperation with the university provost, make proposals for UHP goals, staffing, budget, and expenditures. Later in the meeting, Roberts raised concerns about some of the information included in the already-approved report on the current UHP budget. He questioned the accuracy of some of the expenditures, remarking that the reported figures were "bitching," "did not make sense," and "didn't add up." He questioned whether some of the persons identified in the reports as being affiliated with various UHP activities were actually involved as represented. Roberts also renewed his complaint that "some units don't have a dime to go talk to kids about whatever." Broski took Roberts to be suggesting that the budget committee had "out of whole cloth" created "some fictitious numbers." Broski found these "very serious charges" to be offensive, and he asked the executive director and director of the UHP to recount for the members of the CAC how the budget report had been put together. Roberts said that no such explanation was necessary. Roberts (who is African-American) was not going to argue with "those two Afro-American folk" (i.e., the executive director and director), for he did not believe they had done anything improper with UHP funds, that they were responsible for how those funds were allocated, or that they had anything to do with his own lack of funds for recruitment. At the conclusion of this discussion, the CAC recommended yet another review of UHP budget allocations. Broski subsequently retained an outside minority accounting firm for that purpose.
 
 
 8
 Soon after the June 1995 meeting of the CAC, Anderson learned that no African Americans and only three Hispanic students had been admitted into the class that would be entering the COD that autumn. Anderson avers that in the face of this information, he concluded that Roberts was not working effectively to recruit more minority students for the dental school and, believing that a dentist might be more efficacious in that role, Anderson decided to recommend for the third year in a row that Roberts be issued a terminal, one-year contract.
 
 
 9
 Broski decided to accept Anderson's recommendation and terminate Roberts. On August 17, 1995, the university issued a terminal contract to Roberts for the 1995-96 academic year, which ended on August 31, 1996. Roberts was replaced as the COD's UHP director effective September 1, 1995 and was reassigned to other duties for his final year at the university.
 
 
 10
 In March 1996, Roberts filed this action in the district court. Roberts alleged that Broski, acting under color of state law as the interim chancellor of the university, deprived him of his First Amendment to free speech, in violation of 42 U.S.C. sec. 1983. Specifically, Roberts contended that Broski fired him in retaliation for the remarks he made at the January and June 1995 meetings of the CAC concerning the UHP budget allocations and the accuracy of the budgetary information presented at those two meetings. However, because the district court found the record lacking support for the asserted nexus between Roberts' speech and his subsequent termination, it granted summary judgment in favor of Broski.[1]
 
 
 11
 Judge Alesia found insufficient evidence in the record to support the inference that Roberts' speech was a "substantial" or "motivating" factor in Broski's decision to discharge him. Although Roberts' remarks at the January and June 1995 CAC meetings preceded the termination decision, "'the mere fact that protected speech precedes an employment decision does not create the inference that the speech motivated the employment decision.'" 979 F. Supp. at 752 (quoting O'Connor v. Chicago Transit Auth., 985 F.2d 1362, 1368 (7th Cir. 1993)). Roberts averred that on the day of the January 1995 CAC meeting, Dr. William Wallace, the former executive director of the UHP, overheard Broski threaten to fire Roberts if Roberts spoke at the meeting. But the district judge found no evidence in the record supporting this allegation, and so he disregarded it. Id. at 753. Finally, Roberts held up Broski's suggestion at the January 1995 CAC meeting that it might be preferable to employ one, rather than two, UHP personnel at the COD as an implicit threat to fire Roberts for questioning the UHP budgetary data. But Judge Alesia did not agree that it was reasonable to interpret the remarks in this way. Freeing up money for recruitment efforts by reducing the number of UHP personnel at the COD from two to one was a perfectly reasonable option to raise in response to the very concerns Roberts had been discussing at the meeting, the judge reasoned. Id. at 753-54. And that was all that Broski was doing--citing alternatives that would be explored later. Id. Broski said nothing to indicate that he was actually contemplating the prospect of firing Roberts; indeed, if anyone should have been worried by the remarks, the district court pointed out, it was Martinez, who as Roberts' assistant was the more likely candidate for lay-off or termination. Id. & n.9.
 
 
 12
 Alternatively, Judge Alesia proceeded, the record demonstrated that Broski inevitably would have discharged Roberts irrespective of his remarks. Roberts' superiors had been displeased with his recruitment efforts for quite some time, and Anderson had twice before recommended his discharge. Although Roberts contended that factors beyond his control were responsible for the drop in minority enrollment at the COD, he had not, in the judge's view, produced evidence sufficient to cast doubt upon Broski's bona fides in discharging him for inadequate work performance. Id. at 754-55. Thus, even assuming that Roberts had presented adequate proof of a link between his speech and his subsequent discharge, Broski was nonetheless entitled to summary judgment; for the evidence left no doubt that Broski would have discharged Roberts even if Roberts' speech had played no role in the termination decision. Id.
 
 II.
 
 13
 Maintaining that genuine issues of material fact exist as to whether his speech played a role in his discharge and whether the university would have terminated him irrespective of that speech, Roberts contends that the district court usurped the jury's role as the finder of fact when it granted summary judgment in favor of Broski. Naturally, Broski disagrees, and urges us to affirm on the grounds that the district court identified. Alternatively, Broski proposes a variety of alternative bases on which to affirm the judgment.[2] Having reviewed the record, we agree with Judge Alesia that the evidence before the court does not support the inference that Roberts' remarks (assuming they amounted to protected speech) were a substantial or motivating factor in Broski's decision to discharge him. We affirm on that dispositive basis alone, finding it unnecessary to reach the other issues raised.
 
 
 14
 At the summary judgment stage, Roberts is of course entitled to a favorable construction of the facts as well as the benefit of every reasonable inference that may be drawn from those facts. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). But as to any issue on which he bears the burden of proof, Roberts is obliged to identify evidence that would permit a jury to find in his favor. Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). To establish a violation of his First Amendment rights, Roberts ultimately would have to prove by a preponderance of the evidence that his speech was a substantial or motivating factor in Broski's decision to terminate him. Mount Healthy City School Dist. Bd. of Educ. v. Doyle, supra, 429 U.S. at 287, 97 S. Ct. at 576. Faced with Broski's motion for summary judgment, therefore, Roberts had to produce evidence from which a jury could reasonably discern a link between his speech and the discharge decision. See O'Connor v. Chicago Transit Auth., 985 F.2d 1362, 1368 (7th Cir. 1993).
 
 
 15
 Two of the facts that Roberts has relied upon to establish the nexus between his speech and his discharge have to do with the chronology of events: the university decided to issue him a terminal contract (1) approximately six months after he first questioned the accuracy of the UHP budgetary information in January 1995, and (2) within one to two months after he renewed his criticisms at the June 1995 meeting of the CAC. However, as Judge Alesia pointed out, O'Connor rejected the notion that the chronological relationship between an employee's speech and his discharge alone gives rise to an inference that the speech motivated the employment decision. 985 F.2d at 1368.[3] Roberts insists that a jury might infer a link between his critical remarks and the decision to terminate him from what he sees as the relatively brief expanse of time between the two. Yet he makes no attempt in that regard to confront or distinguish O'Connor, on which Judge Alesia and Broski have both relied.[4]
 
 
 16
 As he did below, Roberts has also represented that Wallace, the former executive director of the UHP, overheard Broski remark prior to the January 1995 CAC meeting that he would fire Roberts if Roberts spoke about the UHP budget. Evidence to that effect might put this case on a different footing, but as the district judge pointed out, there is no such evidence in the record. Before Broski filed his summary judgment motion, the district court had granted Roberts' requests to extend discovery to allow for the deposition of Wallace or service of interrogatories upon him, in the event that Wallace's doctor believed him up to the questioning. (At that time, Wallace was on medical leave from his employment at the university and was hospitalized in New York.) Apparently, Wallace's health never improved sufficiently to permit Roberts' inquiries. While the parties were briefing Broski's summary judgment motion, however, Wallace wrote a letter to the district court in which he stated that, at a CAC meeting during which the UHP budget was discussed, he heard Broski threaten (under his breath) to fire Roberts. The court rejected the letter as an improper ex parte communication but forwarded copies to the parties' respective counsel. The contents of the letter prompted Roberts to file yet another motion for leave to depose Wallace, but the court struck the motion when his counsel failed to appear for a hearing on his request. R. 81. As it stands, the record includes no admissible evidence whatsoever that Broski made the threat, for Wallace's letter is hearsay.[5] The district court obviously committed no error in declining to consider an unsubstantiated allegation on summary judgment. Just as clearly, because Roberts' counsel failed to appear on his final request to extend discovery for the purpose of securing evidence from Wallace, we are presented with no issue as to whether discovery should have been held open for that purpose.
 
 
 17
 Finally, Roberts renews his contention that Broski's remarks about the possibility of employing one rather than two UHP personnel in the COD amounted to an implicit threat that he might terminate Roberts. The proper interpretation of Broski's comments was for the jury rather than the judge, he argues. We agree that it might be possible to construe these remarks as somewhat threatening if they were considered in isolation. In light of what the undisputed facts reveal about the context of the remarks, however, we agree with the district judge that it would be unreasonable to perceive an implicit threat in Broski's words. The purpose of the budgetary information presented and discussed at the two CAC meetings was to provide the CAC and Broski an idea of how UHP funds were being allocated so that alternative uses of the funds in pursuit of minority enrollment could be considered. It was in that context that Roberts voiced his complaint that no money was left for recruitment after his salary and that of his assistant were paid. It was within that same context that Broski reiterated the purpose of the budgetary review, and cited the possibility of employing one UHP person at the COD and supplying that individual with an expense account as an example of the sort of alternative that he would like to have CAC members explore. That context, in our view, strips Broski's remarks of any threatening character; Broski merely seized upon Roberts' complaints as an opportunity to focus council members on the task at hand. We agree with Roberts that when the evidence is reasonably subject to different interpretations, it is for the factfinder to choose among them. See O'Connor, 985 F.2d at 1366, citing Egger v. Phillips, 669 F.2d 497, 502 (7th Cir. 1982), cert. denied, 464 U.S. 918, 104 S. Ct. 284 (1983). The district court's point, however, was that Broski's remarks, considered in context, were not reasonably subject to an ominous interpretation, and Roberts has not adequately addressed himself to that point. We find no fault in the district court's rationale.
 
 III.
 
 18
 Because Roberts has identified no record evidence from which a jury could reasonably infer that his speech was a substantial or motivating factor in Broski's decision to discharge him, we AFFIRM the district court's decision to enter summary judgment in Broski's favor.
 
 
 
 Notes:
 
 
 [1]
 Judge Alesia found the evidence adequate, in the first instance, to support the conclusion that Roberts' remarks at the CAC meetings were protected speech regarding a matter of public concern. 979 F. Supp. at 750-52; see generally Connick v. Myers, 461 U.S. 138, 145-47, 103 S. Ct. 1684, 1689-90 (1983). The criticisms that Roberts raised at the two meetings--including, for example, the assertion that certain of the figures in the budgetary data were "grossly" erroneous--could be construed to imply that the funds allocated to the UHP were being spent improperly, perhaps even illegally. Id. at 750- 51. One could also infer that Roberts voiced these concerns in the public interest rather than in pursuit of purely personal aims; indeed, there was no evidence in the record suggesting that Roberts' speech was motivated by his own private interests. Id. at 751-52. Because the expenditure of public funds was involved, the court summarily dismissed the notion that the university's interest in the efficient delivery of public services might outweigh Roberts' interest in speaking out on this subject. Id. at 752.
 
 
 [2]
 Specifically, Broski argues that (1) at the CAC meetings, Roberts was not speaking as a citizen on matters of public concern and consequently (contrary to the district court's conclusion) his speech was not protected; (2) the university's interest in promoting the efficiency of its services outweighed any First Amendment interest Roberts had in his remarks; (3) Broski is entitled to qualified immunity because his actions did not violate clearly established law; and (4) Roberts' purported failure to mitigate his damages precludes an award of monetary relief and reinstatement would be inappropriate.
 
 
 [3]
 Cf. Leffel v. Valley Fin. Servs., 113 F.3d 787, 794 (7th Cir.), cert. denied, 118 S. Ct. 416 (1997) (disability discrimination case, noting that chronology can support the inference that the plaintiff's discharge was discriminatory in some circumstances: "A bank officer who is praised and given wide discretion in the performance of her duties one day but is confronted with a laundry list of manufactured criticisms and confining performance standards the next may be able to raise an inference that discrimination is afoot by establishing that the only intervening event was the disclosure that she is disabled.").
 
 
 [4]
 Roberts has done no more with O'Connor than to cite it on the first page of his opening brief, for the unremarkable proposition that we review summary judgment decisions de novo. Roberts Br. 1.
 
 
 [5]
 The letter itself represents that Wallace heard Broski make the remark in January 1994, a full year prior to the events at issue here. R. 72 Ex. 8. Possibly that is a typographical error, but on this record, we cannot know.